UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THEODORE MICHAEL, | CV F 02 6227 LJO P |
| Plaintiff, | |
| v. | ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (Docs. 66, 67.) |
| RAYMOND ANDREWS, et. al., | ORDER DISMISSING ACTION (Docs. 66, 67.) |
| Defendants. | ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT |

Theodore Michael ("Plaintiff") is a federal prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971). Pursuant to Title 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the United States Magistrate Judge.

**A.  PROCEDURAL BACKGROUND**

This action is proceeding on Plaintiff's Second Amended Complaint filed on February 4, 2003, alleging that he was denied participation in the Religious Diet Program in violation of his First Amendment rights.  (Second Amended Complaint - Doc. 10.)

On March 20, 2003, and prior to service, Defendants filed an Answer.  (Doc. 11.)  A scheduling order issued on April 10, 2003.  (Doc. 12.)

1

1   On June 26, 2003, in a Motion to Strike the Scheduling Order, Defendants informed the court that the Answer was submitted in response to the initial complaint as that was the only Complaint that had been served on Defendants. (Doc. 17.) The Court vacated its Scheduling Order on September 11, 2003. (Doc. 28.) On September 19, 2003, Defendants filed an Answer to the Second Amended Complaint. A Second Scheduling Order issued on May 12, 2004, and the Court set a Telephonic Trial Confirmation Hearing before Judge Ishii on December 13, 2004, and trial for January 25, 2005.

Pursuant to that Order, Plaintiff filed a timely pretrial statement on October 26, 2004. However, no pretrial statement was filed by Defendants. On December 1, 2004, the District Court issued an Order to Show Cause why sanctions should not be imposed for failing to submit a pretrial statement. (Doc. 50) A return to the Order to Show Cause was filed by Defendants on December 9, 2004. (Doc. 52.)

On December 13, 2004, the District Court conducted the previously scheduled telephonic trial confirmation hearing, vacated the trial date and referred the matter back to the undersigned for the purpose of setting a dispositive motion deadline. (Docs. 53, 54.) The District Court further reopened discovery limited to the exchange of information regarding Plaintiff's special diet. The deadline for the exchange of information expired on December 31, 2004.

On January 19, 2005, the Court held a Telephonic Scheduling Conference for the purpose of setting a dispositive motion deadline. The Court also set dates for a Trial Conformation Hearing and Trial. (Doc. 57.)

On February 7, 2005, Plaintiff filed a Motion for Summary Judgment. (Doc. 59.) The Motion was denied by this Court on August 2, 2005. (Doc. 87.) Defendants filed their Motion for Summary Judgment on February 18, 2005. (Doc. 66.) Defendants filed an Opposition to Plaintiff's Motion for Summary Judgment on March 10, 2005. On April 27, 2005, Plaintiff filed a Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment. (Doc. 85.) Plaintiff filed his Opposition to Defendant's Motion for Summary Judgment on May 18, 2005.

**B. SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when it is demonstrated that there exists no genuine

1  issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.
2  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a Summary Judgment Motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

1   The opposing party need not establish a material issue of fact conclusively in its favor. It
2   is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the
3   parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the
4   "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see
5   whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (*quoting* Fed. R. Civ. P.
6   56(e) advisory committee's note on 1963 amendments).

7   In resolving the Motion for Summary Judgment, the Court examines the pleadings,
8   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if
9   any. Rule 56(c). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at
10  255, and all reasonable inferences that may be drawn from the facts placed before the court must
11  be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (*citing* United States v.
12  Diebold, Inc., 369 U.S. 654, 655 (1962)(*per curiam*). Nevertheless, inferences are not drawn out
13  of the air, and it is the opposing party's obligation to produce a factual predicate from which the
14  inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D.
15  Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).

16  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply
17  show that there is some metaphysical doubt as to the material facts. Where the record taken as a
18  whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine
19  issue for trial.'" Matsushita, 475 U.S. at 587 (*citation omitted*).

## C. UNDISPUTED FACTS[1]

1.  Plaintiff is a federal inmate who as admitted to the Bureau of Prisons in 1999.
    Plaintiff was incarcerated at Terminal Island and was transferred to Taft

---

[1] The following facts are undisputed for the purpose of this Motion. Although Plaintiff submitted an Opposition to the Motion for Summary judgment, Plaintiff neither admitted or denied the facts set forth by Defendants as undisputed nor filed a separate Statement of Disputed facts. Local Rule 56-260(b). Therefore, the Court compiled the instant Statement of Undisputed Facts from Defendants' Statement of Undisputed Facts and Plaintiff's verified Second Amended Complaint and Opposition. Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998) (verified Complaints and Oppositions constitute opposing affidavits for purposes of the summary judgment rule if they are based on facts within the pleader's personal knowledge). Because Plaintiff neither submitted his own Statement of Disputed facts nor addressed Defendants' Statement of Undisputed Facts, the Court accepts Defendants' version of the facts where Plaintiff's verified Complaint and Opposition are not contradictory.

|   |   |   |
|---|---|---|
| 1 |   | Correctional Institution ("TCI") on or about December 3, 1999.[2] (Plaintiff's |
| 2 |   | Second Amended Complaint; Declaration of Brian Maurseth ["Maurseth Decl."] |
| 3 |   | at 3.) |
| 4 | 2. | Prior to his transfer to TCI in late 1999, was enrolled in the Bureau of Prison's |
| 5 |   | Religious Diet Program known as the "Common Fare Program." (Maurseth |
| 6 |   | Decl. at ¶7; Exh. B, Maurseth Decl.) |
| 7 | 3. | Upon his arrival at TCI in December of 1999, Plaintiff was eligible for and placed |
| 8 |   | on Common Fare Program. (Exh. B, Maurseth Decl.) |
| 9 | 4. | The Religious Diet Program at TCI was modeled after the Common Fare Program |
| 10 |   | developed by the Bureau of Prisons to meet the religious dietary requirements of |
| 11 |   | inmates. (Declaration of Everett Uzzle ["Uzzle Decl."] at 2, ¶ 4.) |
| 12 | 5. | TCI's policy was to provide special diets to meet recognized religious |
| 13 |   | requirements and restrictions as feasible in a correctional setting. (Uzzle Decl. at |
| 14 |   | 2, ¶ 4, Exh. A, Uzzle Decl.) |
| 15 | 6. | Plaintiff submitted a request and was approved for placement on the Religious |
| 16 |   | Diet Program on January 25, 2000. Plaintiff listed his religious preference as |
| 17 |   | "Islam/Muslim." (Maurseth Decl. at ¶ 3, 12; Exh. C-2, Maurseth Decl.) |
| 18 | 7. | The TCI Religious Diet Program was revised in August 2000. The revision |
| 19 |   | further clarified religious practices within TCI and set forth in detail, the inmate's |
| 20 |   | responsibilities with respect to their participation in the Religious Diet Program. |
| 21 |   | (Uzzle Decl. at 2, ¶5.) |
| 22 | 8. | Inmates were required to fill out a form requesting placement on the Religious |
| 23 |   | Diet Program. The requests must be verified and authorized by the Chaplain. |
| 24 |   | (Uzzle Decl. at 2, ¶5.) |
| 25 | 9. | Inmates committing violations such as consuming foods other than those provided |
| 26 |   | in the program would be removed from the program. (Uzzle Decl. at 2, ¶ 5; Exh. |

---

[2] Although Defendant Maurseth indicates in his Declaration the date of Plaintiff's transfer to TCI as October 12, 1999, the attachments provided show the date as December 3, 1999.

1  B, Uzzle Decl.)

10. As of August 3, 2000, Orthodox Jews were restricted to a Kosher diet. Meat could be eaten as long as it there was no contact between the meat and milk in cooking, serving or eating. In addition, no shell fish could be had but other fish could be had as long as it had fins and scales. (Exh. B-12, Uzzle Decl.)

11. Sunni Muslims were restricted to a diet free from pork. (Uzzle Decl. at 3, ¶ 5, Exh. B-14, Uzzle Decl.; Unmarked Exh. A at 3, Plaintiff's Unmarked Opposition.)

12. In July 2001, TCI policy was again revised. This revision set forth the periods of removal from the program for violations, which included eating foods other than those provided for in the program and purchasing foods from the commissary that were not in keeping with the inmates' respective faith requirements. (Uzzle Decl. at ¶ 6; Exh C-2, D-2, Uzzle Decl.)

13. In January 2002, TCI policy was again revised. This revision expanded the Religious Diet Program guidelines to include the ceremonial slaughter of meat for those inmates indicating a religious preference of Islam, Sunni Muslim. (Maurseth Decl. at ¶ 10; Exh. D, Maurseth Decl.)

14. In June 2002, Plaintiff again made a request and was approved for religious diet. This time Plaintiff indicated his religious preference as "Sunni Muslim - Islam." (Exh. C-3, Maurseth Decl.)

15. TCI is a non-pork facility - meaning port is not offered at any meal. Pork products are available from the commissary. (Maurseth Decl. at ¶ 13.)

16. There are three types of meal programs available to the inmates at TCI: (1) The Mainline Meal option consists of a buffet-style selection where inmates choose from a variety of food items. Inmates have the option to select a soy-based meat replacement item as an option. (2) The Mainline Alternative provides inmates with a specially prepared meal including a meat alternative that conforms to their particular religious dietary restrictions. (3) The Kosher meal was designed to

|   |   |   |
|---|---|---|
| 1 |  | comply with Orthodox requirements regarding the ceremonial slaughter of |
| 2 |  | animals and is served on paper.  (Maurseth Decl. at 4, ¶ 11.) |
| 3 | 17. | When inmates desire to be placed in the Religious Diet Program, they submit a |

17. When inmates desire to be placed in the Religious Diet Program, they submit a written request which is then reviewed and approved or disapproved by the Chaplain based on his interview with the inmate and an analysis of the inmate's religious dietary requirements.  If the inmate's request is approved, his name is placed on a master list known as a Camp Religious Diet Log ("CRDL.").  (Uzzle Decl. at ¶ 5; Declaration of Tony Barraza ["Barraza Decl."] at 2, ¶ 2.)

18. These logs are updated every Monday morning and given to the Food Service Supervisor who stations herself at the beginning of the food line at each meal.  (Barraza Decl. at 2, ¶3.)

19. When the inmate on the Religious Diet Program comes to the dining hall to receive meals, they must show their identification card to the on-duty Food Services Supervisor who then notes the receipt of the Religious Diet Program meal by entering her initials in a box next to that inmate's name according to the day and meal received, i.e., breakfast, lunch or dinner.  (Barraza Decl. at 2, ¶ 3.)

20. Religious Diet Program meals were prepared and available to Plaintiff during his time at TCI.  (Barraza Decl. at 3, ¶5; Maurseth Decl. at 3, ¶15.)

21. Plaintiff was removed from the program from time to time for repeated violations.  Nevertheless, during may of his suspensions from the program, Religious Diet Program meals were prepared and made available to him.  (Barraza Decl. at 3, ¶4-5; Maurseth Decl. at 3, ¶7, at 6, ¶15.)

22. During the years 2001 and 2002, Plaintiff missed numerous approved Religious Diet Program meals.  (Barraza Decl. at 3, ¶5; Maurseth Decl. at 6, ¶15; Uzzle Decl. at 3, ¶7.)

23. In early 2003, TCI implemented a change to include Jewish and Sunni Muslim diets on the same menu. Although the strict tenets of the Sunni Muslim religion did not require special meal preparation, the program was expanded to include the

    ceremonial slaughter of meat per the inmates requests. (Maurseth Decl. at 5; Exh. D-4, Maurseth Decl.)

24. On May 1, 2003, Plaintiff requested and was approved for a Kosher diet. Plaintiff listed his religious preference as "Islam (Muslim)." (Exh. B, C-4, Maurseth Decl.)

25. Plaintiff was transferred to La Tuna Correctional Facility in June 2003. (Exh. A, Maurseth Decl.)

**D. ANALYSIS**

  *1. Summary of Complaint*

  Plaintiff's Second Amended Complaint alleges specifically that Defendants denied him participation in the Religious Diet Program. (Second Amended Complaint at 5.) Plaintiff states that in November of 2001, he requested that he be given a special diet for Muslims but that it was denied because it was TCI's policy was that only Orthodox Jews could have the Religious Diet Program. Id. Plaintiff alleges that Defendants failed to offer him any alternative or accommodate his religious needs in any way. Id. at 7. Plaintiff alleges that the Defendants conspired to falsely inform him that he, as a Muslim, was not entitled to the Religious Diet Program. Id. at 9. Plaintiff is seeking injunctive and monetary relief.

  *2. Claims for Relief*

  The First Amendment to the United States Constitution provides that Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof. U.S. Const., amend. I. The United States Supreme Court has held that prisoners retain their First Amendment rights, including the right to free exercise of religion. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). The Court has also recognized that limitations on a prisoner's free exercise rights arise from both the fact of incarceration and from valid penological objectives. Id.; McElyea v. Babbit, 833 F. 2d 196, 197 (9th Cir. 1987).

  Prison regulations alleged to infringe on the religious exercise right must be evaluated under the "reasonableness" test set forth in Turner v. Safley, 482 U.S. 78, 89-91 (1987). O'Lone, 382 U.S. at 349; Freeman v. Arpaio,125 F.3d 732, 736 (9th Cir. 1997) (recognizing that the

United States Supreme Court's recent decision in City of Boerne v. P.F. Flores, 521 U.S. 507 (1997), invalidated the Religious Freedom Restoration Act and restored the "reasonableness test" as the applicable standard in free exercise challenges brought by prison inmates).

In this case, Plaintiff alleges simply that his First Amendment Rights were violated beginning in November 2001, when his request for participation in the Religious Diet Program was denied. (Second Amended Complaint at 5.) Plaintiff alleges that this was a policy of TCI and that it infringed on his First Amendment Rights. Id.

Defendants argue that Plaintiff was authorized to participate in the Religious Diet Program and did participate in the Religious Diet Program during the time he was incarcerated at TCI. (Memorandum of Points and Authorities ["Memo."] at 6.) The Undisputed Facts ("UF") show that prior to Plaintiff's arrival at TCI in December of 1999, Plaintiff was enrolled in the Religious Diet Program then known as the "Common Fare Program." (UF # 2.) Upon his arrival at TCI, Plaintiff was again enrolled in the Common Fare Program. (UF # 3.) The Religious Diet Program at TCI was modeled after the BOP's Common Fare Program. (UF # 4.) TCI policy at the time was to provide special diets to meet recognized religious requirements and restrictions as feasible in a correctional setting. (UF # 5.) Following the placement of a request, the Chaplain would review the request and make a determination as to whether the inmate's religious tenets required an alternative diet ("Mainline Alternative" - providing non-meat substitutes) to those offered to all inmates on the Main Line Diet. (UF # 8.)

The undisputed facts are that on January 25, 2000, Plaintiff made a formal request to participate in the Religious Diet Program.[3] (UF # 6.) The document shows that Plaintiff's religious preference was "Islam/Muslim." Id. The document further and bears the signature of the Chaplain indicating that Plaintiff's participation was approved. Id.

According to the documentation provided by Defendants, Plaintiff was transferred out on a federal writ in August of 2000. (Exh. A-2., Maurseth Decl.) Plaintiff was removed from the

---

[3] Although Defendants present evidence that a request for participation in the program indicating a religious preference designation as a Buddhist, was on file for Plaintiff. It does not contain Plaintiff's signature and has inconsistent information regarding Plaintiff's Inmate or "Register" number. (Exh. C-1, Maurseth Decl.) Further, Plaintiff disputes that he submitted this document. (Unmarked Opposition at 4.)

1  Religious Diet Program on September 3, 2000, and reinstated to the program on February 26,
2  2002.  (Maurseth Decl. at ¶ 7; Exh. B, Maurseth Decl..)
3       In January of 2002, the Religious Diet Program was revised to include the ceremonial
4  slaughter of meat for Sunni Muslims. (UF # 13.)   On June 14, 2002, Plaintiff's Request for a
5  Religious Diet was again approved, this time by Defendant Maurseth.  (UF # 14.)  Plaintiff
6  indicated here that his religious preference was  "Sunni Muslim-Islam." Id.  The form clearly
7  indicates that Plaintiff was approved for the Mainline Alternative Diet, which, according to the
8  TCI Religious Property Matrix in place at the time, required a diet free from pork and meat not
9  ceremonially slaughtered. (Exh. C-3, Maurseth Decl.; Exh. B-14, Uzzle Decl.)
10      On May 1, 2003, Defendant Krantz approved another Request for Religious Diet
11 submitted by Plaintiff.  (UF # 24.)   Plaintiff again indicates again that his Religious Preference is
12 "Islam (Muslim)" and he was approved for a Kosher Diet.  (Exh. C-4, Maurseth Decl.)
13      The Court finds Defendants have met their initial burden of informing the Court of the
14 basis of the motion and identifying those portions of the record believed to demonstrate the
15 absence of a genuine issue of material fact.  Accordingly, the burden shifts to Plaintiff to
16 demonstrate that a genuine issue of material fact exists.  See, Matsushita Elec. Indus.Co. v.
17 Zenith Radio Corp., 475 U.S. 574, 586 (1986).  As stated above, in attempting to establish the
18 existence of this factual dispute, plaintiff may not rely upon the mere allegations or denials of his
19 pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or
20 admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e);
21 Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d
22 747, 749 (9th Cir. 1973).
23      In his Opposition, Plaintiff concedes that he was granted participation and access to the
24 Mainline Alternative Menu.  (Unmarked Opposition at 4.)   However, he now argues that he was
25 denied participation in the *Kosher Menu* during the entire time he was incarcerated at TCI. Id.
26 This claim is entirely distinct from his allegation in the Second Amended Complaint that he was
27 denied participation in the Religious Diet Program altogether.
28      In support of his new claim, Plaintiff provides the Affidavit of Albert M. Bursey Jr. who

1 is a practicing Muslim and has been incarcerated by the Bureau of Prisons since 1999. However, the Court finds Mr. Bursey's affidavit irrelevant to the claims at issue here. The affidavit merely confirms Plaintiff's belief that consuming a Kosher diet is consistent with the religious practices of a Sunni Muslim. However, it does not answer the question as to whether or not Plaintiff was denied participation in the Religious Diet Program.

As the Second Amended Complaint alleges that Plaintiff was denied participation in the Religious Diet Program, and the Plaintiff has failed to offer any evidence that there exists a disputed issue with respect to this claim, the Court finds Defendants are entitled to Summary Judgment.

In an abundance of caution and to the extent Plaintiff's allegation in the Second Amended Complaint is sufficient to put Defendants on notice of the claim that he was wrongly denied a Kosher diet, the Court examines Plaintiff's new allegation.

According to the evidence presented by Defendants, TCI was a "non-pork facility," meaning that pork was not offered in any form at any meal. (UF # 15.) Pork products are only available through the TCI Commissary, however, it is an Religious Diet Program violation for inmates on pork restrictions to purchase and consume these items. Id. At all times relevant to Plaintiff's incarceration there existed three types of meals available to the inmates. (UF # 16.) The first meal is designated as the "Regular Main Line" meal which is a buffet style food line. Id. at ¶ 11. The second type of meal is the "Main Line Alternative" which provides inmates with a non-meat substitute such as a soy based meat replacement. Id. The third option is the Kosher diet which is only available whose religion required such a meal. Id.

According to the Second Amended Complaint, Plaintiff first made a request for a "special diet" on or about November 26, 2001. (Second Amended Complaint at 5.) At that time, Plaintiff's preferred religion was "Islam/Muslim," which required only a non-pork diet. (Exh. C-2, Maurseth Decl.; Exh. B-14, Uzzle Decl.). Plaintiff submitted another request for a Religious Diet which was approved on June 14, 2002 by Defendant Maurseth and granted him access to the Mainline Alternative Meal. (Exh. C-3, Maurseth Decl.) Although TCI policy was revised in July 2001, the revisions only increased the periods of removal from the program for food violations.

1  (UF # 12.)  Thus, Plaintiff's religious requirement that he have a diet free from pork could be
2  accommodated by either the Mainline Meal or the Mainline Alternative Meal.
3      In early 2003, TCI implemented a revision to the Religious Diet Program to include
4  Jewish and Sunni Muslim diets on the same menus. (UF # 23.)  This diet was available to
5  Orthodox Jews and Orthodox Sunni Muslims only.  Id.  The definition was expanded later to
6  include the Sunni Muslims and others in the Religious Diet Program, including the Nation of
7  Islam at the request of the inmates. (Maurseth Decl. at ¶ 14.)   However, the strict tenets of the
8  Sunni Muslim religion did not at the time require special meal preparation. Id.  Thus, according
9  to the evidence and undisputed facts, Plaintiff was approved for and received the diet appropriate
10 to his religious requirements.
11     The Court finds that the Defendants have met their initial burden of informing the Court
12 of the basis of the motion and identifying those portions of the record believed to demonstrate the
13 absence of a genuine issue of material fact.  Accordingly, the burden shifts to Plaintiff to
14 demonstrate that a genuine issue of material fact exists that he was entitled to and did not receive
15 a Kosher diet. See, Matsushita Elec. Indus.Co.  v.  Zenith Radio Corp., 475 U.S. 574, 586
16 (1986).
17     In the Opposition, Plaintiff asserts, without supporting evidence, that he was entitled to a
18 Kosher Diet. (Unmarked Opposition at 3.) Plaintiff states that the Kosher diet is the "most
19 compatible with Sunni Muslims." (Unmarked Opposition at 5.)
20     Inmates clearly retain their right to free exercise of religion in prison, O'Lone v. Estate of
21 Shabazz, 482 U.S. 342, 348 91987), and are entitled to "receive diets consistent with their
22 religious scruples." Kahane v. Carlson, 527 F.2d 492, 495 (2nd Cir. 1975.)  The undisputed facts
23 are that Plaintiff was approved for and afforded the dietary program consistent with the tenets of
24 the faith he indicated as preferred on the Request for a Religious Diet.  (UF # 6, 14, 24.) That
25 Plaintiff was not provided the diet of his choice does not rise to the level of a constitutional
26 violation.
27     Plaintiff's claim is further flawed in that there is a lack of evidence and allegation that any
28 of the named individuals denied him a religious diet on any specific occasion.  The Civil Rights

Case 1:02-cv-06227-NEW   Document 88   Filed 08/22/05   Page 13 of 14

Act under which this action was filed provides:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute plainly requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by the plaintiff. See Monell v. Department of Social Services, 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976). The Ninth Circuit has held that "[a] person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978). In order to state a claim for relief under section 1983, plaintiff must link each named defendant with some affirmative act or omission that demonstrates a violation of plaintiff's federal rights.

Plaintiff's basis for liability in the Second Amended Complaint is that he was denied participation in the Religious Diet Program. Although the Second Amended Complaint alleges generally that all of the Defendants "personally participated in and knew of the unconstitutional violations and failed to act to prevent them," Plaintiff provides no facts linking any of the Defendants to an act or omission that gave rise to an alleged Constitutional violation.

Plaintiff also contends that the Defendants were involved in a conspiracy to violate his rights, however, he again alleges no facts to support the existence of a conspiracy between the Defendants. In the context of conspiracy claims brought pursuant to Section 1983, a Complaint must "allege [some] facts to support the existence of a conspiracy among the defendants." Buckey v. County of Los Angeles, 968 F.2d 791, 794 (9th Cir. 1992); Karim-Panahi v. Los Angeles Police Department, 839 F.2d 621, 626 (9th Cir. 1988). Here, Plaintiff provides only conclusory allegations that a conspiracy existed. However, this is insufficient to state a claim for relief under Section 1983.

13

1  To the extent Plaintiff is trying to hold Defendants liable under a theory of supervisory
2 liability, he again fails to state a claim for relief. "A supervisor may be liable under § 1983 only
3 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a
4 sufficient causal connection between the supervisor's wrongful conduct and the constitutional
5 violation." Jeffers v. Gomez, 267 F.3d 895, 915 (9th Cir.2001).  In other words, supervisors "can
6 be held liable 'only if they play an affirmative part in the alleged deprivation of constitutional
7 rights,' [i.e. by] 'set[ting] in motion a series of acts by others ..., which he knew or reasonably
8 should have known, would cause others to inflict the constitutional injury.' " Graves v. City of
9 Coeur D'Alene, 339 F.3d 828, 848 (9th Cir.2003) (*citations omitted*) (*quoting* Rise v. Oregon, 59
10 F.3d 1556, 1563 (9th Cir.1995); Larez v. City of LA, 946 F.2d 630, 646 (9th Cir.1991)).

Plaintiff provides only a conclusory statement that Defendants personally participated in and knew of the alleged constitutional violation. However, he provides no facts to support his claims. As previously discussed, the Court finds no disputed issue of fact warranting trial on the claim that Plaintiff's First Amendment Rights were violated. As such, there can be no supervisory liability.

## E. CONCLUSION AND ORDER

Accordingly, the Court finds Plaintiff has failed tender evidence demonstrating that a disputed issue of fact exists. Accordingly, Defendants are entitled to Summary Judgment.

The Court HEREBY ORDERS:

1. Defendants Motion for Summary Judgment is GRANTED;
2. The instant action is DISMISSED;
3. The Clerk of Court is DIRECTED to enter Judgment in favor of Defendants;
4. Any pending Motions are DENIED as moot.

This Order concludes the action in its entirety.

IT IS SO ORDERED.

Dated:   August 21, 2005              /s/ Lawrence J. O'Neill
b9ed48                                UNITED STATES MAGISTRATE JUDGE